IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| Plaintiff | REPORT AND RECOMMENDATION |
| v. | 08-cr-151-bbc |
| TERRANCE A. McCAULEY, |  |
| Defendant. |  |

_____

### REPORT

The grand jury has indicted defendant Terrance McCauley on two counts of cocaine trafficking.  McCauley has moved to suppress the crack cocaine that underlies Count 2, arguing that the police discovered it through an illegal weapons frisk.  This is a close case. I am recommending the court deny McCauley's motion because the police had probable cause to arrest McCauley prior to searching him, even though they had not actually placed him under arrest.  If the only basis for discovery of the crack cocaine was a weapons pat down during an investigative detention, then this evidence should be suppressed.

On December 11, 2009, this court held an evidentiary hearing on the motion. Having heard and seen the arresting officer testify, I find the following facts:

### FACTS

At about 12:30 a.m. on December 12, 2008, Fitchburg Police Officer Matthew Wiza responded to St. Mary's Hospital to interview a person claiming to have been beaten.  Officer Wiza met with David Neely, the victim, and his girlfriend Willie Aikens.  Officer Wiza noticed that Neely had a large knot or bruise on top of his head, a bruise on his knee, and other contusions and cuts, including a cut lip.

Neely explained that he had received a phone call earlier that evening from "Twin," who claimed that Neely owed him $40.  Neely drove to Twin's apartment in the High Ridge Trail neighborhood in Fitchburg in order to square the debt.  Neely was able to provide a specific description of the location, although he could not provide an apartment number.  Neely reported entering the apartment and paying Twin the $40.  Then Twin punched Neely and accused him of taking too long to  pay.  Another man present in the room grabbed Neely and held him by the neck while Twin beat Neely with a baseball bat.  Neely provided a physical description of Twin, including the observation that Twin was wearing electronic monitoring bracelet.  Neely described the man who held him as black, approximately 5'0" feet to 5'4", medium build (around 125 pounds) with collar-length hair.  Neely did not call the police or head straight to the hospital, but drove around for several hours (apparently with Aikins in the car) debating what to do until Aikins finally persuaded him to seek medical treatment.  Aikens told Officer Wiza Neely had had a crack cocaine problem at one time,

These circumstances led Officer Wiza, based on his training and experience, to suspect that Neely's debt to Twin was drug-related, but apparently he did not pursue this suspicion with Neely.  Officer Wiza updated his sergeant, who was able to ascertain that Twin might be Mica Johnson, who resided in the High Ridge area and who currently was on electronic monitoring.  Officer Wiza got an address and drove to Johnson's apartment.  Neely's instructions on how to find Johnson's apartment turned out to be accurate.  Two other Fitchburg police officers were there to back up Officer Wiza.  Officer Wiza parked his squad car about 30 feet from the entrance to Johnson's apartment, which opened to an outdoor stoop.  It was between 1:30 and 2:30 a.m. on September 12, 2008.

2

Officer Wiza went to the front door.  He could hear that some sort of social gathering was occurring inside.  He knocked for several minutes.  The door was opened by a black man about 5'0" to 5'4" tall, with a slender build and collar length braided hair, who matched Neely's description of the man who had grabbed him around the neck.  The man was wearing loose-fitting jeans and a tank top.  Officer Wiza told the man that he was there to talk to him; the man shut the door and locked it.

Undaunted, Officer Wiza continued to knock on the door until a different man answered.  This man matched Neely's description of Twin, including electronic monitoring bracelet on his ankle.  This man stayed on the threshold of the doorway and asked what Officer Wiza wanted.  Officer Wiza responded "I think you know why I'm here."  The man shut the front door, locked it, and shut off the lights.

Still undaunted–and irritatingly tenacious–Officer Wiza resumed knocking on the front door for five to ten minutes more.  No one answered, but the man who had first answered the door (who matched Neely's description of his restrainer) stepped outside with a woman and began walking away.  Officer Wiza wanted to question this man before he went back inside, so he immediately placed handcuffs on him and walked him toward Officer Wiza's squad car.  The man did not resist.  When asked to identify himself, he said he was "Anthony Minor."  We now know that this actually was defendant Terrance McCauley.  McCauley is about 5'6" tall.

Officer Wiza wanted to question McCauley in a location separate from what was going on about them, so he decided to put McCauley in his squad car.  First he performed a weapons pat down.  He did this because everything he had heard and seen that night led him to believe this whole scenario was drug related and, based on his training and experience, drug dealers

3

tended to be armed.  It was obvious, however, that McCauley did not have a baseball bat with him when he left the apartment.

While patting McCauley's left leg, between the shin and the thigh, Officer Wiza felt a plastic baggie of a rock-like substance.  Officer Wiza testified that "it felt to me like a plastic baggie of crack cocaine" and added that "based on the call and some other factors that – and obviously me feeling it, it felt, based on my training and experience, that it could possibly be crack cocaine." Dkt. 31 at 10-11.  About five times previously in his police career Officer Wiza had come across a similar-feeling object; in every case it had been crack cocaine or another drug.

During cross examination Officer Wiza provided this testimony:

| | |
|---|---|
| Defense Counsel: | You testified on direct examination that when you first felt that object, you believed it to be either a weapon or contraband; is that correct? |
| Officer Wiza: | Say that again. |
| AUSA: | [I'm] going to object.  I don't believe that's what he testified to.  It misstates his testimony. |
| Defense Counsel: | Well, what did that package feel like to you, officer? |
| Officer Wiza: | It felt to me like a plastic baggie of crack cocaine. |
| Defense Counsel: | What about it made it feel like crack cocaine versus anything else? |
| Officer Wiza: | I guess the texture of it, where it was. |
| Defense Counsel: | Did you manipulate it to feel the texture of it? |
| Officer Wiza: | Yeah, I mean I ran it through my fingers; I mean squeezed it, I guess, a little bit. |

Transcript. Dkt. 31. at 22-23.

4

It seemed to Officer Wiza as if the object was floating freely inside McCauley's pant leg; believing that the object "could possibly be crack cocaine," Officer Wiza gently pulled at McCauley's pant leg to free the object.  It took "barely any manipulation" of the pant leg to cause the suspended object to fall to the ground. Dkt. 31 at 11.  The object looked like a rock of cocaine in a bag.  Also in the bag were some pills that turned out to be MDMA (ecstasy).  Officer Wiza formally arrested McCauley.

ANALYSIS

McCauley argues that the crack cocaine discovered in his pant lag must be suppressed because Officer Wiza lacked reasonable suspicion to perform a weapons pat-down, *see Terry v. Ohio*, 392 U.S. 1, 24 (1968) and he exceeded the limits of the "plain feel" exception to the warrant requirement, *see Minnesota v. Dickerson*, 508 U.S. 366, 373-75 (1993).  The government responds that prior to the search, Officer Wiza had probable cause to arrest McCauley for battery, allowing a full search incident to arrest.  As a fallback position, the government argues that Officer Wiza had reasonable suspicion to pat down McCauley for weapons frisk and that Officer Wiza then discovered the crack pursuant to the plain feel doctrine.  McCauley challenges all of the government's contentions in his reply brief.

### (1) Probable Cause To Arrest

After advocating a finding of probable cause, the government focuses more on whether a search "incident" to an arrest may precede the actual arrest.  The answer appears to be "yes," under narrow circumstances.  In  *Holt v. Simpson*, 340 F.2d 853, 855-56 (7th Cir. 1965), the court held that:

5

> When probable cause for an arrest exists independently of what the search produces, the fact that the search precedes the formal arrest is immaterial when the search and arrest are nearly simultaneous and constitute for all practical purposes but one transaction.  To hold differently would be to allow a technical formality of time to control when there has been no real interference with the substantive rights of a defendant.

340 F.2d at 856.

Despite its age, *Holt* appears to be good law in this circuit.  Similarly, in *United States v. Ricard*, 563 F.2d 45, 49 (2nd Cir. 1977) the court held that it was not a Fourth Amendment violation for a patrol officer who had stopped defendant for speeding to reach into the defendant's jacket pocket to pull out a packet of cocaine prior to arresting him for speeding.  Notwithstanding the age of the *Ricard* opinion, just last month a federal court adopted its rationale to justify a search prior to arrest.  *See Evans v. Solomon*, ___ F.Supp.2nd ___, 2010 WL 276189  *13 (E.D.N.Y. Jan. 19, 2010); *see also United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998)(warrantless search preceding arrest is constitutionally reasonable if (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search).  *Cf. Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (if police have probable cause to arrest and the arrest quickly follows the challenged search, then it is not particularly important that the search preceded the arrest rather than vice versa).

Of course, none of this matters if there was no probable cause to arrest McCauley.  Police have probable cause to arrest a suspect if, at the time of the arrest, the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person of reasonable caution in believing that the suspect has committed an offense.  *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).  "Whether the police officer acted on probable cause is determined based

6

on the common-sense interpretations of reasonable police officers as to the totality of circumstances at the time of arrest." *United States v. Villegas*, 495 F.3d 761, 770 (7th Cir. 2007). An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once the officer has established probable cause, he may end his investigation. *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009). A victim's testimony may, by itself, establish probable cause; where a person reports being struck by someone and the officer observes head wounds consistent with the report, this is sufficient to establish probable cause that a battery has occurred. *Id.*

Further, it is irrelevant whether a police officer has formulated the subjective intent to arrest a suspect at the time the officer pats down the suspect. The Fourth Amendment's focus on reasonableness dictates an objective analysis: if the facts and circumstances known to the officer would have justified an arrest, then there is no constitutional violation. *Williams v. Rodriguez*, 509 F.3d 392, 399 (7th Cir. 2007); *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) (officer's statement that handcuffed suspect was not under arrest does not change the fact that there was probable cause to arrest him for a traffic violation, thus rendering his custody reasonable).

Neely reported being held and beaten with a bat by two men, and Officer Wiza saw the resulting head injuries. As a result, Officer Wiza had probable cause to believe that two men had beaten Neely several hours earlier. Neely gave a detailed description of the location where he was beaten and a fairly detailed description of who held him and who struck him, including the rather singular fact that Twin was wearing a monitoring bracelet on his ankle. This allowed the police to triangulate on Micah Johnson, who still was socializing with company at his

7

residence when Officer Wiza came knocking after midnight.  So, the operative question boils down to whether the circumstances known to Officer Wiza when McCauley departed Johnson's apartment were sufficient to warrant Wiza's belief that McCauley was the person who had held Neely while Johnson beat him.[1]

      When there is a challenge to whether the police reasonably believed that the person they are arresting is the person for whom they have probable cause to arrest, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Tibbs v. City of Chicago*, 469 F.3d 661, 664 (7th Cir. 2006), quoting *Hill v. California*, 401 U.S. 797, 804 (1971).  In *Hill*, the police had probable cause to arrest a man named Hill and went to his apartment to look for him.  There they found Miller, who fit the description of Hill provided by several sources.  Miller insisted he was not Hill and showed ID that he was Miller, but the police did not believe him.  The police also were suspicious that Miller was inside Hill's locked apartment and that he denied knowledge of any guns when a pistol and clip were in plain sight on the coffee table.[2]  *Id*. at 799.   The Court found probable cause to support Miller's arrest, even though the police "were quite wrong as it turned out."  *Id.* at 804.  The actual holding of *Hill* dealt with the search of Hill's apartment that followed the mistaken arrest of Miller, but the point remains that Court found that probable cause supported Miller's arrest based on the arrestee fitting a physical description of the suspect and being found at the suspects apartment, even though the arrestee claimed he was not the suspect and had documents to prove it.

---

     [1]  While there was probable cause to believe that Johnson administered the beating, this court's record is silent on whether Johnson ever was arrested, charged or convicted of this battery.

     [2]  It is not clear how these facts made it more probable that Miller was Hill, so they don't advance the analysis much.

In *United States v. Carpenter*, 342 F.3d 812 (7ᵗʰ Cir. 2003), a bank robbery case, two defendants argued that the police had arrested them based on nothing more than their propinquity to a more obvious suspect. The court agreed that mere propinquity would not equal probable cause, but "that does not mean propinquity is irrelevant." *Id.* at 815. The court noted that the defendants resembled the physical descriptions of the robbers, and that a two inch height difference from the descriptions was not material since probable cause does not require that a suspect "exactly match" witnesses' descriptions. *Id., citing Pasiewicz v. Lake County Forest Preserve District*, 270 F.3d 520, 522 (7ᵗʰ Cir. 2001)(probable cause existed to arrest suspect who bore "fair resemblance" to witness's descriptions of age, height, weight and hairstyle). The court noted other suspicious activity by the defendants, most notably that when observed in propinquity to defendant, they had engaged in conduct that might be characterized as counter surveillance. *Id.*

Here, Officer Wiza had probable cause that Johnson had beaten Neely earlier that evening in Johnson's apartment. McCauley was there with Johnson, about six or seven hours later. McCauley matched Neely's description of the man who held him except that he was two inches taller than Neely's upper estimate of 5'4". Even so, this lack of an exact match does not negate probable cause. A 5'6" man still is on the short end of the spectrum, below average height. This confluence of physical description, timing and propinquity are sufficient to establish probable cause that McCauley was the man that held Neely during the beating.

There's one additional fact that could be added to the mix, although its relevance is debatable: when Officer Wiza told McCauley that he was there to talk to McCauley, McCauley closed and locked the door rather than submit to questioning. On the one hand, McCauley was

9

in a private residence that the police had no authority to enter, and he had a right not to answer police questions.  On the other hand, Officer Wiza, having seen McCauley in the doorway, was justified in concluding that McCauley was his suspect and could have arrested him at that point. In other words, Officer McCauley had enough evidence to move this encounter past a consensual one from which McCauley would have been free to walk away.  *Cf. United States v. Jerez*, 108 F.3d 684, 692-93 (7th Cir. 1997)(late night police harassment of suspects asleep in a motel room, in the absence of reasonable suspicion is an unconstitutional seizure).  So, perhaps one could view McCauley's failure to cooperate with Officer Wiza's investigation as a small indicium of culpability: unprovoked flight sometimes creates reasonable suspicion all by itself, and here, McCauley decided to retreat and bolt the door rather than submit to investigation detention. On the other hand, "flight" is distinguished from "going about one's business," which ordinarily has no investigative significance.  *See Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008).  It would be a mistake to accord much significance to McCauley's decision to ignore what essentially was a *request* for an interview.  Also, McCauley later exited out of the same door, walking right into the clustered police officers rather than attempt to avoid them.  Taking all of this into account,  I have not relied on the circumstances of the initial encounter in determining probable cause to arrest.

The bottom line remains, however, that Officer Wiza had probable cause to arrest McCauley prior to searching him, and the actual arrest followed immediately after discovery of the suspected crack cocaine.  Therefore, McCauley suffered no deprivation of his Fourth Amendment rights that would require suppression of the crack cocaine recovered during the search.

The fact that Officer Wiza had decided to attempt to interview McCauley rather than arrest him immediately–as he could have–demonstrates the subjective prudence and restraint that the community expects from its police officers, but as noted above, the Fourth Amendment inquiry is strictly objective.  Further, courts are to invoke the exclusionary rule only where it will result in appreciable deterrence of illegal police conduct, *see United States v. Carter*, 573 F.3d 418, 522 (7th Cir. 2009); it would stand the rule on its head to discourage the type of incremental investigation Officer Wiza employed here.

This is sufficient to end the analysis of McCauley's motion to suppress.  For completeness's sake, I address the parties' other arguments regarding investigative detentions and the plain feel doctrine.

### (2) Reasonable Suspicion for an Investigative Detention and a Weapons Pat Down

A police officer may detain a person briefly for investigation if the officer has reasonable suspicion that the person has committed a crime.  To justify such a detention, the officer must point to specific and articulable facts that suggest criminality so that he is not basing his actions on a mere hunch.   Reasonable suspicion is less than probable cause and considerably less than a preponderance of the evidence.  *Jewett*, 521 F.3d at 823. Courts must evaluate a claim of reasonable suspicion under the totality of the circumstances.  *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009).

In *Booker*, a witness described to police a person and a van that might have been involved in a battery to the witness's relative earlier that evening.  The witness reported hearing a possible gunshot during earlier self-help attempts by the victim's family.  The witness was not the victim

and the police saw no visible signs of injury on the victim to support the report.  Police saw a matching van leaving the address where the battery allegedly took place, driven by a man who did not closely match the description provided by the witness.  Different officers nonetheless stopped the van, removed the driver (the defendant) and patted him down.  Inside the van the officers saw and seized a firearm that formed the basis of the gun charge against the defendant. *Id.* at 836-38.  After noting all the reporting omissions and discrepancies, the court nonetheless found that reasonable suspicion justified stopping the van.  *Id.* at 839-40.  (Because the challenged firearm was in plain view inside the van, the court did not analyze whether it had been appropriate for the officers to pat down the defendant for weapons.)

As noted in the previous section, I have concluded that the police had probable cause to arrest McCauley prior to detaining and patting him down.  In the event this conclusion is incorrect, these same facts easily provided Officer Wiza with reasonable suspicion to detain McCauley briefly to question him.

The next question is whether it was reasonable for Officer Wiza to pat down McCauley for weapons (or even to handcuff him).  "[T]he touchstone is reasonableness: were the officer's actions reasonable in light of all the circumstances?"  *Jewett*, 521 F.3d at 825.  Courts are to evaluate whether the force that an officer used was disproportionate by considering whether the surrounding circumstances gave rise to a justifiable fear for personal safety.  A protective pat-down for weapons is appropriate if police have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the police or to others.  This standard is less demanding than probable cause and requires only a minimal level of objective justification for performing the pat down.  When police are evaluating a situation, they are entitled to consider

12

practical considerations of everyday life.  *United States v. Kenerson*, 585 F.3d 389, 392 (7th Cir. 2009).

In *Kenerson* an anonymous informant passed a tip about an imminent drug deal by a named person in a specified car at a specific apartment building.  Police went there and surveilled activities that looked like a hand-to-hand drug sale.  When they stopped the car in which the suspected buyer was a passenger (based on a traffic violation), the driver provided a story that the police knew was false from what they already had seen.  The officers patted down the suspect and felt a bulge in his back pocket that was "not inconsistent" with a weapon.  They asked him what it was; they buyer said "nothing" and opened up the pocket.  The officers saw the corners of three plastic baggies, which turned out to contain crack cocaine.  *Id.* at 391-92.  At a subsequent suppression hearing, the government established that this incident took place in a neighborhood with a high frequency of gun crime.  The court rebuffed the suspect's (now defendant's) challenge to the weapons pat down, finding that the officers had reasonable suspicion that the defendant was a drug dealer, that drug dealers often are armed, and that the "plain feel" doctrine did not apply because the officers saw the baggie corners.  *Id.*  At 392.

In this case, the government justifies the handcuffing and weapons frisk of McCauley by observing that the reported crime was battery with a weapon and that Officer Wiza believed it was drug related.  McCauley seeks to marginalize the government's drug deal justification by labeling it a racist "Hail Mary" attempt, but his argument is unpersuasive.  The attackers' savage reaction to late payment of a mere $40 debt, Neely's "past" problem with crack, and his reluctance to seek medical treatment for palpable head injuries were sufficient to cause a trained

13

patrol officer reasonably to suspect that this entire incident arose out of a drug debt.[3]  As a result, Officer Wiza was entitled to protect himself while investigating further.  "It is an unfortunate fact of life that trade in controlled substances is dangerous for all involved." *Kenerson*, 585 F.3d at 392; *see also United States v. Askew,* 403 F.3d 496, 507 (7th Cir. 2005) (the danger inherent in stopping suspected drug traffickers, for whom guns are known tools of the trade, warranted a highly intrusive *Terry* stop).

Granted, Officer Wiza did not have nearly the amount of information about drug dealing that the officers had in *Kenerson*, but he did have probable cause that his suspects were violent men who had beaten Neely early that evening.  Officer Wiza admitted that McCauley did not appear to be carrying a baseball bat when he left Johnson's apartment, but it would be logical for Officer Wiza to more concerned about smaller, concealed weapons that might pack more punch.  "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry.*"  *Jewett,* 521 F.3d at 825.

As for the handcuffs, it would be easy after the fact to question their need, but McCauley already had demonstrated by his actions that he would not submit willingly to an investigative detention, so the use of handcuffs was not so debatable as to render the stop an arrest from the outset.  In short, although this case does not present a highly persuasive  set of facts for the government, it appears that Officer Wiza's suspicions of drug dealing and apprehensions of possible danger were sufficient to justify the brief use of handcuffs and a weapons pat down.

---

[3]  It might have been helpful to know the nature of the conviction for which Johnson was on a monitoring bracelet and the amount of drug dealing known to occur in the High Ridge Trail neighborhood, but the parties did not develop the record on these points, so the court will not speculate about them.

14

### (3) The Plain Feel Doctrine

This takes us to the nature and extent Officer Wiza's tactile manipulation of the object he encountered inside the leg of McCauley's pants.  There is not a lot of case law out there on how much tactile manipulation is too much to constitute a plain feel, but what little there is does not help the government.  In *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the Court resolved a nationwide jurisprudential split over whether the plain-feel doctrine was a valid exception to the warrant requirement of the Fourth Amendment.  The Court started by noting that the weapons frisks authorized by *Terry v. Ohio*, 392 U.S. 1 are not intended to discover evidence of crime but to allow the police to investigate without fear of violence.  Therefore, weapon pat downs must be "strictly limited to that which is necessary for the discovery of weapons" so that "if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."

Even so, within the bounds of *Terry*, if police detect nonthreatening contraband during a weapons frisk, they may seize it and use it as evidence.  508 U.S. at 373.  More specifically, if during a weapons frisk the officer "feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons."  In response to the Minnesota supreme court's concern that the sense of touch was inherently less immediate and less reliable than the sense of sight, the Court found that touch was reliable enough to allow the exception, and to the extent that an officer's sense of touch was not sufficiently reliable, "that only suggests that officers will less often be able to justify seizures of unseen contraband."  *Id.* at 376.  The Court found this to be true on the facts presented to it: because the officer determined that the lump

15

was contraband "only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket," the officer had "overstepped the bounds of the strictly circumscribed search for weapons allowed under *Terry*." *Id*. at 378.

Although this seems straightforward, courts have struggled with what "immediately" means in real life, and how much manipulation is too much. *See, e.g., United States v. Yamba*, 506 F.3d 251, 258 (3rd Cir. 2007) (reviewing recent cases). The court in *Yamba* held that the operative question should be: Did the frisking officer determine that the object was contraband before he determined that it was not a weapon? *Id*. at 259. If so, the plain feel search is valid. If not, the search violates *Terry*. At least two other circuits have reached the same conclusion. *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) and *United States v. Rogers*, 129 F.3d 76, 79 (2nd Cir. 1997). The government cites *Rogers* for the proposition that *Dickerson* allows an officer to manipulate any suspicious object for a few seconds to determine its nature, *see* 129 F.3d at 80, but this is true only if that manipulation occurs as part of a permissible patdown search for weapons. *Id*. In *Rogers*, the officer performing the weapons patdown felt a hard object in the defendant's pocket and manipulated it for a few seconds to determine what it was; the officer felt a hard object and a softer object. The court observed that "At that point, [the officer] was not yet able to exclude the possibility that there was a weapon in the pocket, so that the search was still within the bounds of *Terry*." *Id*. at 79.

In this case, Officer Wiza had only just begun his weapons pat down McCauley when he felt a lump inside McCauley's pant leg, but the operative question actually is whether Officer Wiza's subsequent manipulation of this object was for the purpose of determining whether it was a weapon. Defense counsel asked this question but the government objected, so counsel

16

moved on.  As a result, the record is that Officer Wiza did not ever think the object was a weapon.  Nonetheless, Officer Wiza manipulated the object to feel its texture: "Yeah, I mean I ran it through my fingers; I mean squeezed it I guess, a little bit."  This is exactly what the Court forbade in *Dickerson*.

Believing that what he was feeling "possibly could be cocaine," Officer Wiza manipulated McCauley's pant leg for the purpose of causing the object to fall out.  Perhaps Officer Wiza meant to imply otherwise, but this testimony suggests that he wasn't sufficiently certain of his conclusion actually to seize the object, so instead he continued to manipulate McCauley's clothing so that the object would fall into plain view.  This isn't allowed either.  In *United States v. Askew,* 529 F.3d 1119 (D.C. Cir. 2008), a plurality of the *en banc* court held that the police violated the defendant's Fourth Amendment rights by partially unzipping his outer jacket during a show-up identification procedure so that a robbery victim could see whether the defendant's sweatshirt matched the robber's:

> Because the police officer's unzipping of appellant's jacket went beyond what was necessary to protect the investigating officers or others nearby, it amounted to precisely the sort of evidentiary search that is impermissible in the context of a *Terry* stop.

239 F.3d at 420.[4]

Although *Askew* is not the law of this circuit, it makes a valid point: the plain view doctrine must remain strictly circumscribed so that the exception doesn't swallow the rule.  *Terry* frisks are for officer safety, not the discovery of evidence.  Tugging at a pant leg so that an object can drop into plain view constitutes an evidentiary search.

---

[4] Four judges dissented on grounds that don't advance the government's argument in the instant case.  *See* 529 F.3d at 445 (Sentelle, CJ, Kavanaugh, Henderson and Randolph, JJ, dissenting).

In sum, although it was proper for Officer Wiza to pat down McCauley for weapons, his manipulation of the object inside McCauley's pant leg was an evidentiary search that exceeded the permissible scope of the weapons frisk.   In the event this court determines that Officer Wiza did not have probable cause to arrest McCauley before performing the pat down, then this was an unreasonable search.  If this is where the court lands, then it should grant McCauley's motion to suppress.   My recommendation however, is to deny the motion based on the analysis in Section (1), above.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I am recommending that this court deny defendant Terrance McCauley's motion to suppress evidence.

Entered this 2nd day of February, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

18